**STUDENT COALITION FOR PEACE**

v.

**LOWER MERION SCHOOL DISTRICT, et al.**

**Civ. A. No. 84–1017.**

United States District Court,
E.D. Pennsylvania.

Jan. 31, 1985.

Stephen F. Gold, Philadelphia, Pa., for plaintiff.

Thomas A. Masterson, Philadelphia, Pa., for defendants.

MEMORANDUM AND ORDER

JAMES McGIRR KELLY, District Judge.

Presently before me is plaintiff Student Coalition for Peace's (SCP) motion for reconsideration of the court's denial of its petition for a permanent injunction. *Student Coalition for Peace v. Lower Merion School District*, 596 F.Supp. 169 (E.D.Pa. 1984).

Plaintiff, in its motion for reconsideration, has brought to the court's attention,

the Equal Access Act, P.L. No. 98–377 (August 11, 1984). As there has been no judicial interpretation of this Act, the matter before me is one of first impression.

The plaintiff, SCP, a student organization, sought the use of one of four locations on school property for the site of an anti-nuclear war rally and peace exposition. The public was invited to attend this rally. The SCP sought one of the following locations: Lower Merion High School's (LMHS) courtyard which surrounds the flagpole, Arnold Field, Pennypacker Field, or the LMHS Boys' Gym. All four locations are owned by the defendant Lower Merion School District, a public school system. In my Memorandum and Order of September 28, 1984, 596 F.Supp. 169, in accordance with the United States Supreme Court opinion in *Perry Ed. Assn. v. Perry Local Education Assn.*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), I held that all four locations were not public or limited public forums. Further, I held that the defendants'[1] denial of the use of the parcels by the student group for a peace exposition was rationally related to a legitimate governmental interest and that the denial was not based upon an intent to censor a particular point of view or the content of the speech. *Student Coalition for Peace v. Lower Merion School District*, 596 F.Supp. at 175. (The defendants did not want the LMHS's property to become a battleground of political thought for the community. Indeed, the plaintiff intends to invite the outside public to its exposition.)

The plaintiff contended at the hearing for a permanent injunction that because two of the locations desired had been used by other student groups, which also were permitted to invite the outside public, the defendants had converted these locations into public or limited public forums. For the sake of clarity here, I will reiterate my

findings concerning these locations which are more fully set out at 596 F.Supp. 169 (E.D.Pa.1984).

(a) The LMHS's courtyard, which surrounds the flagpole, and Pennypacker Field—have never been used for any non-school sponsored event. *Id.* at 173–174.

(b) LMHS Boys' Gym—besides being a gymnasium, has been used for non-school sponsored events, but only by permission granted by the School Board. *Id.* at 174. The non-school sponsored events which have used the facility were primarily athletic and were initiated to raise funds for charity. However, although the fund raising events were non-school sponsored, student organizations were a force in establishing the events. The public was invited to attend the charity functions. *Id.* at 173–175.

(c) Arnold Field—has been used primarily by the school as an athletic field. Several times the school has permitted certain community oriented activities to take place on the field. These activities were primarily athletic activities, namely jog-a-thons and bike hikes, which were oriented to raising funds for various public charities. School students as well as the public were invited. Often times the students initiated these activities. Additionally, the school granted permission to the community to have its Memorial Day ceremonies on the field. *Id.* at 173–175. It must be noted, however, permission was not granted for every request made.

I turn now to the instant motion. Plaintiff contends that the Equal Access Act P.L. No. 98–377 (August 11, 1984) requires[2] a finding of a limited public forum at the LMHS Boys' Gym and Arnold Field.

The Equal Access Act states in pertinent part:

---

1. Lower Merion School District, Board of School Directors.

2. The plaintiff concedes the fact that LMHS's courtyard and Pennypacker Field cannot be a public forum or even a limited public forum, since no nonschool sponsored activities (by stu-

dents or the public) take place at these locations. Moreover, plaintiff has not argued for these two locations on its motion. Accordingly, I will now affirm my holding of September 28, 1984, 596 F.Supp. 169 as to these two locations.

## DENIAL OF EQUAL ACCESS PROHIBITED

Sec. 802(a). It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings.

(b) A public secondary school has a limited open forum whenever such school grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time.

(c) Schools shall be deemed to offer a fair opportunity to students who wish to conduct a meeting within its limited open forum if such school uniformly provides that—

(1) the meeting is voluntary and student-initiated;

(2) there is no sponsorship of the meeting by the school, the government, or its agents or employees;

(3) employees or agents of the school or government are present at religious meetings only in a non-participatory capacity;

(4) the meeting does not materially and substantially interfere with the orderly conduct of educational activities within the school; and

(5) nonschool persons may not direct, conduct, control, or regularly attend activities of student groups.

The Lower Merion School District is a public school system which inevitably receives some federal financial funding. Therefore, the Equal Access Act would apply to the school district. Equal Access Act § 802(a), *supra*. The SCP is a student organization which is not school sponsored. A student group is not school sponsored

when it does not receive funding or supervision from the school. Indeed, the SCP is a noncurriculum related student group, however, it is assigned a faculty advisor.[3] The SCP has not been hindered in expressing itself within the school community on school property. *Student Coalition for Peace*, 596 F.Supp. 169, 170 (E.D.Pa.1984). The dilemma here is that the plaintiff SCP seeks to have a public peace exposition on the school property at one of the above named locations. Therefore, nonstudents will be invited to this peace exposition. The school district seeks to keep the general public from turning school property into a podium for political debate. Thus, it has denied plaintiff's request.

The plaintiff contends that because the school district has permitted other non-school sponsored activities (noncurriculum related and initiated by students) which permitted the public to use Arnold Field and the LMHS Boys' Gym, the defendants have created a limited open forum under the Equal Access Act. Moreover, the plaintiff argues that because it only requests that outsiders be permitted to attend one meeting annually (the peace exposition), the restriction expressed in the Equal Access Act that nonschool persons may not regularly attend, is complied with. Equal Access Act § 802(c)(5) *supra*.

Plaintiff interprets § 802(c)(5), *supra*, as to infer that since a meeting within the limited open forum does not permit regular attendance of nonstudents, but does not expressly forbid occasional or irregular attendance by nonstudents, attendance by nonstudents cannot be forbidden. Further, plaintiff argues that because the school district allowed nonstudent attendance at certain charitable functions which were activities promoted by nonschool sponsored student groups at the Boys' Gym and Arnold Field, these two locations became limited open forums under the Equal Access Act. Specifically, plaintiff argues that

---

**3.** This is consistent with the Equal Access Act § 803(2) which states:

The term 'sponsorship' includes the act of promoting, leading, or participating in a meet-

ing. The assignment of a teacher, administrator, or other school employee to a meeting for custodial purposes does not constitute sponsorship of the meeting.

§ 802(b), *supra,* becomes operative at these two locations.

I do not read the statute broadly granting rights to outsiders, because of the express use of the limiting choice of the words used within the statute, namely, the word "student". Furthermore, the statute expressly states: denial of equal access is forbidden to *students* where a limited public forum exists. § 802(a), *supra.* However, I do not believe that plaintiff's arguments are so strained as to end my search for the meaning of the statute here.

Accordingly, the debate in Congress during its evaluation of this statute must be examined and scrutinized so as to find the legislative intent of the statute.[4] This must be done to determine whether or not the purpose of the statute is to alter the characterization of public property for first amendment purposes as was enunciated by the Supreme Court in *Perry, supra,* and most importantly in the instant matter, whether or not the Equal Access Act requires that a public secondary school which receives federal financial assistance must permit attendance of non-students in a limited public forum (as defined within the Equal Access Act) within the school. The discussion in the House of Representatives led to the following rather clear comment as expressed between two congressmen, one of which was the principal co-sponsor of the bill (Congressman Goodling):

> Mr. PEPPER. Mr. Speaker, will the gentleman kindly tell me whether the student groups that may have this access are limited to the sudents of the particular school, or may students come in from other schools?
>
> Mr. GOODLING. It is very definitely limited to the students in the school. The administration determines that.

They do not allow students to come in from other schools.

> Mr. PEPPER. The language of the legislation does not say that.
>
> Mr. GOODLING. I am sorry. I did not hear the gentleman.
>
> Mr. PEPPER. The language of the legislation does not say that.
>
> Mr. GOODLING. The language of the legislation says that all these decisions are local school board decisions. I do not know of any board that says that anybody who wants to come in from all over the world can just come in. We do not do that. We say that the local school district makes that decision and that determination, and that is protected.

130 CONG.REC. H7732 (daily ed. July 25, 1984).

Congresswoman Schneider, in expressing her support for the Equal Access Act stated in pertinent part: "... [R]estrictions have been placed on the participation and attendance of outside individuals in these student meetings." 130 CONG.REC. H7740 (daily ed. July 25, 1984).

During the discussion in the Senate of the Equal Access Act, much concern was expressed relative to whether or not the nonstudents would be permitted onto the school grounds. Pertinent to this discussion Senator Hatfield, a key promotor of the statute, stated:

> We are not making it equal access to people outside of the schools. I have talked to people who took the phrase 'equal access' to mean that we were going to give equal access to every ... organization in the country to get into the schools. That is not it at all. It is purely a right of the students to have access to school facilities, to have meetings, when one or more make the request of the administration and within the con-

---

4. *See Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.), *affirmed* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945) where the distinguished Judge Learned Hand.so well stated:

> Of course, it is true that the words used, even in their literal sense, are the primary, and ordinarily the most reliable source of interpreting the meaning of any writing: be it

a statute, a contract, or anything else. But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purposes or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.

text of the rules and regulations governing all school activities.

This sets no precedent of any special right, nor does it do other than give equal rights in that school, which is now being denied in many places.

\*     \*     \*     \*     \*     \*

Those outsiders, if they participate at all, are to be under the same rules and regulations as any outsiders permitted on the school grounds and school facilities.

130 CONG.REC. S8337 (daily ed. June 27, 1984).

Another statement made during the discussion of this Statute in the Senate was:

... [U]nless the school generally allows outsiders to participate in student meetings on school premises, this amendment would not require the school to allow outsiders to participate in religious meetings.

130 CONG.REC. S8355 (daily ed. June 27, 1984) (Statement of Sen. Levin).

■ Indeed, here plaintiff argues that because the school district has allowed nonstudents to attend charitable events at Arnold Field and the Boys' Gym, the school district has created a limited open forum. However, this specific matter was addressed in my September 28, 1984 Memorandum in this action. 596 F.Supp. 169 (1984). Moreover, the defendant school district has not permitted nonstudents to use the two facilities as a matter of general course. Permission to use Arnold Field has not been freely granted. *Id.* at 173. The defendant school district has kept close reins on the use of the Boys' Gym by outsiders. *Id.* at 174. Other pertinent viewpoints expressed during the Senate discussion for the Equal Access Act are the following:

Nor does it [Equal Access Act] force a school to permit the indiscriminate incursion of any and all outsiders into the school premises.

\*     \*     \*     \*     \*     \*

Moreover, it specifically does not authorize any school board to admit non-school personnel, ensuring that no automatic right of admission would be created for any outside individual, whether a cult leader or a mainstream minister.

130 CONG.REC. S8362–63 (daily ed., June 27, 1984) (Statement of Sen. Thurmond).

Finally, in the words of the chief senate sponsor: "... [O]utsiders will gain no additional access rights to public schools." 130 CONG.REC. S8349 (daily ed., June 27, 1984) (Statement of Sen. Denton).

From the discussion of the Equal Access Act in Congress, the intent seems to be one of codifying the Supreme Court's opinion relative to those decisions concerning free speech on public school property. It was not the intent of Congress to expand the *concept* of a limited public forum as was characterized in *Perry, supra; Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). Rather it was Congress' intent to expand the *application* of the Supreme Court's decision in *Widmar* to secondary schools.

The issue before the Supreme Court in *Widmar* was whether or not a state university which makes its facilities generally available for the activities of registered student groups, may close its facilities to a registered student group desiring to use the facilities for religious worship and religious discussion. *Id.* at 264–65, 102 S.Ct. at 271–72. Moreover, Congress, by enacting the Equal Access Act, further intended that the content of the speech which could not be discriminated against within the limited public forum to include: religious, political, philosophical, or other content of the speech at such meetings. Equal Access Act § 802(a), *supra.*

Senator Hatfield stated pertinent to this matter:

We could sit back and wait until some court case is appealed to the Supreme Court, and the Supreme Court, under the precedent of the *Widmar* case—I am not a lawyer, but I would predict that the Court would rule in the same way when it related to a secondary school.

\*     \*     \*     \*     \*     \*

... For those [schools] that do have [a limited open forum], what we are saying is that once this school establishes that forum, and borrowing from the Court in the *Widmar* case in the State of Missouri, once the school set up that forum, it should not discriminate as to the content of the speech in that forum.

130 CONG.REC. S8337, 8342 (daily ed. June 27, 1984).

Senator Levin stated relative to the expansion of the *Widmar* decision to public secondary schools:

Today the law is confusing and the school's response to requests by students in different parts of the country varies depending upon the State's interpretation of constitutional law. There is disagreement in the schools today about whether students can be permitted to meet and, if so, about how the school can honor such requests by students without offending the establishment clause. Because of the importance of free speech, we need to clarify the right of student initiated religious groups to be treated in a non-discriminatory manner. At the same time, the pending amendment will provide clearer guidelines to school officials regarding how the religious free speech rights of students can be protected without impinging upon the establishment clause of the First Amendment. The safeguards established in the Hatfield amendment will ensure that school officials do not cross the line between accommodation of secondary student's right to free speech and State-sponsored religion, which is prohibited by the first amendment.

I am persuaded that the pending amendment is constitutional in light of the Supreme Court's decision in *Widmar* against Vincent. This amendment merely extends a similar constitutional rule as enunciated by the Court in *Widmar* to secondary schools. However, all we are doing here is passing a statute which will not supersede the U.S. Constitution. Ultimately, the courts will decide whether *Widmar* applies to secondary schools, and if so, whether the amendment before

us is consistent with the first amendment. In the meantime, this amendment will clarify the law and require schools to adopt policies which do not discriminate against student-initiated religious speech. If we are to err, we should err on the side of guaranteeing that free speech is not stifled.

\*　　\*　　\*　　\*　　\*　　\*

The Supreme Court has held in *Widmar* that once a university has opened its facilities for use by student groups, it cannot exclude specific groups because of the religious content of their speech. This amendment seeks to codify that principle at the secondary school level, with appropriate additional conditions thereby protecting the free speech rights of students.

130 CONG.REC. S8355 (daily ed., June 27, 1984).

Another chief supporter of the Equal Access Act in the Senate stated:

... [T]his bill seeks only to clarify and extend the law of that case [*Widmar*] a bit. The Court held in *Widmar* that a public university, the University of Missouri, which generally held its buildings open to student groups for meetings after classroom hours could not exclude from that policy a group of students who wanted to meet to talk about religion, and perhaps have a devotional.

\*　　\*　　\*　　\*　　\*　　\*

What we seek to do by this amendment is make clear that the same rule of law applies to students in our public secondary schools. The courts have never said that this is not the case, in fact they would probably agree with us if the proper case were before them. But the simple fact is that the Supreme Court had never had an equal access case involving secondary students.

130 CONG.REC. S8356 (daily ed. June 27, 1984) (remarks of Sen. Bumpers).

One other supporter of the Equal Access Act in the Senate stated:

It is now time for Congress to extend this protection [the ruling enunciated in *Widmar* ] to the public school systems of this nation.

130 CONG.REC. S8355 (daily ed., June 27, 1984) (remarks of Sen. Thurmond).

In *Widmar, supra,* the Supreme Court held that once a university opens its facilities to student organizations, it cannot regulate the content of the speech absent a compelling state interest. The Court further stated that the establishment clause is not offended by the mere discussion of religious topics by students within the limited public forum.[5]

When a court evaluates the meaning of a statute, the proper analysis would dictate that the court examine the language of the statute. *United States v. Rabb,* 680 F.2d 294 (3d Cir.1982) *cert. denied,* 459 U.S. 873, 103 S.Ct. 162, 74 L.Ed.2d 135 (1982). Here the language of the Equal Access Act does not dictate that if a limited open forum is created for students on school property, as was the situation in *Widmar, supra,* that this limited open forum must include nonstudents under its umbrella of first amendment protection. The Equal Access Act specifically provides for the protection of certain types of speech within the school, where a limited public forum has been created. The Equal Access Act specifically states that nonstudents' regular attendance may be excluded. § 802(c)(5). Conversely, it does not require that nonstudents be permitted to attend on an infrequent basis. Plaintiff interprets the Equal Access Act to the effect that it provides new expanded meaning to the status of a limited public forum. Plaintiff wishes this court to believe that the Equal Access Act would expand a limited public forum from one limited to students to one which would permit nonstudent attendance, if at some time nonstudents were permitted to attend some school activities, albeit, under conditions that required specific school permission.

█ When a court examines the intent of a statute, it will view the subjective intention of the legislature which enacted it. *Brigham v. United States,* 539 F.2d 1312 (3d Cir.1976) (The Court will view not only the language of a statute but also its intent). *United States v. Rabb, supra.* (Although the literal meaning of the words chosen by Congress is respected, the court no longer follows a rigid, semantic approach to statutory construction, lest the court construe a statute within its letter, but beyond Congress' intent). After examining the extensive debate and discussion which Congress entertained, I cannot view the Equal Access Act as providing new and expanded constitutional rights of speech to a group not within the contemplation of Congress, namely outsiders or nonstudents. The Equal Access Act must be viewed in light of the hesitation many members of Congress had as they envisioned a stampede of nonstudents taking over the local schools under the cloak of being invited to attend student functions.

█ The plaintiff in the instant matter has argued that because on a few occasions nonstudents were permitted to attend charitable athletic events sponsored by non-school sponsored student groups, these parcels or locations in question have been converted to a limited public forum. This is incorrect. As was stated in my prior Memorandum and Order, 596 F.Supp. 169 denying the permanent injunction, these parcels in question (Arnold Field and the Boys' Gym) are strictly regulated with permission not being freely granted.[6] *Id.* at 173.

---

**5.** The Court further held that the school's limited public forum applied to the students not to nonstudents, thus the school could exclude nonstudents because of the content of their speech. *Widmar,* 454 U.S. at 267–68, n. 5, 102 S.Ct. at 273–74, n. 5 (1981). However, I am not saying that if a school district by its actions or in its exercise of discretion created a limited public forum which included nonstudents within the parameters of the limited public forum, it could exclude the nonstudents because of the content of their speech; exclusion would then be only justified where the state demonstrated a compelling state interest was being served.

**6.** *See also Jarman v. Williams,* No. 83–0406 (E.D.Ark.W.Div. February 16, 1984) affirmed 753 F.2d 76 (8th Cir.1985) (School Board's willingness to allow gymnasium to be used for

In conclusion, the Equal Access Act is not applicable to the narrow question raised by the plaintiff, namely, whether or not a school district may deny access to its facilities to a noncurriculum related student group which intends to invite nonstudents/the general public to its anti-nuclear rally and peace exposition where it has not been a policy or practice of the school to indiscriminately permit the use of the facilities in question to other noncurriculum related student groups which desired to invite nonstudents/the general public. Traditional constitutional analysis is applicable to the questions raised by the plaintiff. This analysis was applied in my prior Memorandum and Order denying the permanent injunction. 596 F.Supp. 169. Accordingly, plaintiff's motion for reconsideration will be denied. I affirm my denial of permanent injunction.

karate, gymnastics, piano lessons and by Boy Scouts, Girl Scouts and booster clubs does not transform public property into a public or limited public forum). Perhaps if the anti-nuclear/peace exposition was an athletic activity, and was for a charitable purpose, then the SCP may fall within an established limited public forum.

*See Student Coalition for Peace v. Lower Merion School District,* 596 F.Supp. 169, 174 n. 6 (E.D. Pa.1984); *Perry Ed. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 46, n. 7, 103 S.Ct. 948, 955, n. 7, 74 L.Ed.2d 794 (1983). However, this is not the case before me, therefore, I cannot rule upon it.