STUDENT COALITION FOR PEACE, on behalf of its members and other high school students enrolled in the Lower Merion High School, by its spokesperson, Harold Wolpert, Appellants,

v.

LOWER MERION SCHOOL DISTRICT BOARD OF SCHOOL DIRECTORS, Paul C. Heintz, Anne M. Smith, Ray W. Nelson, Jr., Reaves C. Lukens, Jr., Henry C. Lucas III, Regina B. Cohen, John P. Giangiullo, Roger J. Williams, Jr., Meridyth M. Senes, James B. Pugh, Superintendent of Schools, Lower Merion School District, and Robert M. Ruoff, Principal, Lower Merion High School, Appellees.

No. 85–1092.

United States Court of Appeals, Third Circuit.

Argued Sept. 9, 1985.

Decided Nov. 5, 1985.

Stephen F. Gold (argued), Philadelphia, Pa., for appellants.

Thomas A. Masterson (argued), Frank L. Corrado, Jr., Morgan, Lewis & Bockius, Philadelphia, Pa., for appellees.

Before SEITZ, BECKER, and ROSENN, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

Appellant Student Coalition for Peace, a student organization at Lower Merion High School, appeals from the district court's denial of its request for a permanent injunction ordering the appellee School Board to permit it to use school property for a "Peace Fair." Appellant rests its claim on the First Amendment and the recently-enacted Equal Access Act, 20 U.S.C.A. §§ 4071 *et seq.* (Supp.1985). We have jurisdiction by virtue of 28 U.S.C. § 1291 (1982).

### I.

The Student Coalition for Peace (SCP) is a student organization at Lower Merion High School (LMHS), dedicated to the cause of world peace through nuclear disarmament, and in particular through a bilateral nuclear freeze. In early 1983, SCP members requested permission of Robert Ruoff, principal of LMHS and a defendant here, to use an athletic field on school premises, known as Arnold Field, for a Peace Fair.[1] Ruoff refused the request. After unsuccessful appeals to the School Superintendent and the Lower Merion Board of School Directors (the Board), both defendants here, SCP held a Peace Fair on April 30, 1983 at another field not under the Board's jurisdiction, approximately five miles from LMHS.

Arnold Field has been regularly used for nonschool sponsored community events. A

---

1. SCP, because it does not receive school funding and is not subject to school supervision, is not considered a "school sponsored" organization. Nonschool sponsored student · organizations are given access to school facilities on the same basis as community groups. The applicable school regulations state that facilities are available by permission "for appropriate purposes to any resident or group of residents whose membership is composed essentially of residents of the Lower Merion School district at times which do not interfere with the educational program of the school."

Memorial Day service has been held on the field each year since 1945, a service that includes speeches and ceremonies honoring the Nation's war dead. The field has also been used for a Special Olympics for handicapped children, and a "Bike Hike" to benefit the mentally retarded, the latter under the sponsorship of a LMHS student organization. The field, which is fenced but unlocked, is also used regularly without permission by members of the community for jogging, bicycle riding, picnics, and similar activities. The district court found that the school had in the past also rejected requests to use the field by nonschool sponsored groups.

In December 1983, SCP again asked Ruoff for the use of Arnold Field for a second Peace Fair, to be held on April 28, 1984. This fair, like the last, was to be open to the public. Planned activities included speakers on the subjects of peace and nuclear disarmament, distribution of literature, and various forms of entertainment. Ruoff again denied the request, stating in a letter that "the intended use is not deemed appropriate under the policy of the Lower Merion Board of School Directors. Arnold Field is to be used for athletic or governmental purposes."

SCP appealed Ruoff's decision to Dr. James Pugh, the school superintendent. The SCP letter to Dr. Pugh stated that the organization would also be satisfied with the use of Pennypacker Field—another athletic field on the LMHS premises—or the LMHS boys' gym. Dr. Pugh denied the request to use any of the proposed sites. He stated that Arnold Field was "limited to athletic or governmental events," and that "[t]he limited use of Arnold Field is not a written policy but has been a long-standing practice of the Lower Merion School District." He also stated that SCP's request to use the boys' gym was denied because of the potential damage to the wooden gym floor. Finally, Dr. Pugh suggested that SCP discuss with Ruoff the possibility of

using the LMHS auditorium and lobby for its fair.

SCP again appealed, this time to the Board. In a letter to the Board, SCP rejected the auditorium and lobby as unsuitable for the fair, apparently because it was too small and insufficiently open for the activities contemplated. SCP also reiterated its request to be permitted to use Arnold Field, Pennypacker Field, or the boys' gym. The Board denied SCP's request to use any of the proposed sites, although it again offered to permit the group to use the school auditorium. Defendant Paul Heintz, President of the Board, justified the Board's decision on the grounds that the fair might create crowd control problems, and that the school was not an appropriate forum for a "political rally." Heintz, an attorney, also expressed concern that permitting SCP to use any of the fields would legally disable the Board from rejecting other student requests to use the field.

SCP brought suit in the district court, seeking declaratory relief and preliminary and permanent injunctions ordering the Board and its co-defendants to permit SCP to use one of the proposed outdoor sites or the boys' gym for the fair. The complaint was grounded solely on the First Amendment and 42 U.S.C. § 1983 (1982). After two days of hearings, the district court issued a preliminary injunction ordering the defendants to permit SCP to use one of the requested sites for the peace fair. Pursuant to the injunction, a Peace Fair was subsequently held in the LMHS boys' gym.[2]

After further hearings on July 27, the district court entered judgment for the defendants on September 28, 1984, 596 F.Supp. 169, denying SCP's request for a permanent injunction. The court, following the analysis of the Supreme Court in *Perry Educ. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), determined that none of

**2.** Since SCP, according to its complaint, "plans to hold annual Peace Fairs until the threat of nuclear annihilation has been eliminated," the

holding of a fair in 1984 did not render this case moot.

the requested sites was either a traditional public forum or a public forum by designation. The court found further that the Board could reasonably permit "charitable" or non-controversial events such as the Special Olympics and the Bike Hike while excluding "political" events such as the Peace Fair. Finally, it found that the defendants had not acted with intent to discriminate against the viewpoint espoused by SCP.

SCP then moved in the district court for reconsideration. Based solely on facts already in evidence, it argued for the first time that the defendants' refusal to permit the Peace Fair to be held on school grounds violated the Equal Access Act, which the President had signed into law on August 11, 1984. On January 31, 1985, 618 F.Supp. 53, the court denied the motion. This appeal followed.

## II.

■ The analysis we follow in determining whether appellants have a First Amendment right to use Arnold Field is that set forth by the Supreme Court in *Perry Educ. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), and more recently in *Cornelius v. NAACP Legal Defense Fund*, ___ U.S. ___, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). The Court has stated repeatedly that "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *U.S. Postal Service v. Council of Greenburgh Civic Assns.*, 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981). Instead, the right of access depends on the nature of the government property at issue.[3] If the property is a traditional or designated public forum, appellants can be excluded on the basis of the subject matter of their speech "only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Cornelius*, 105 S.Ct. at 3448. If, however, the property sought to be used is not a public forum, "[c]ontrol over access ... can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Id.* at 3451.

### A.

■ We find slight merit in appellant's contention that Arnold Field constitutes a traditional public forum.[4] Traditional public fora—of which streets and parks are the paradigmatic examples—are those public spaces which have by long practice "been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). A traditional public forum has as its primary purpose to promote free public traffic and assembly. *See International Society for Krishna Consciousness, Inc. v. New Jersey Sports and Exposition Auth.*, 691 F.2d 155, 160 (3d Cir.1982); *U.S. Southwest Africa/Namibia Trade & Cultural Council v. United States*, 708 F.2d 760, 764–66 (D.C.Cir.1983). Thus, not every place that permits free public access is for that reason a traditional public forum. *Greer v. Spock*, 424 U.S. 828, 836, 96 S.Ct. 1211, 1216, 47 L.Ed.2d 505 (1976); *United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983).

■ Appellants conceded in the district court that Arnold Field is not a traditional public forum, and the district court so found. Assuming *arguendo* that appellants have not by their concession in the district court waived their right to raise the issue here, we agree with the district court.

---

**3.** There is no assertion here that the Peace Fair does not constitute First Amendment protected speech. Nor is there doubt that the Board's refusal to permit SCP to use school facilities was based on the content of that speech.

**4.** Our focus in this opinion is on Arnold Field rather that the other school facilities appellants wish to use. Appellants' claim to those other facilities is far less compelling than their claim to Arnold Field, but our reasoning applies to all.

Arnold Field is, in the first instance, a school athletic field. Appellees' practice of permitting generous public access to the Field did not change its primary function or otherwise convert it into a traditional public forum.

### B.

■ A public forum by designation differs from a traditional public forum in three respects. *Perry,* 460 U.S. at 45–46, 103 S.Ct. at 954–55. First, property may be so characterized, not by virtue of its essential nature or purpose, but because the government has acted to open what would otherwise be a nonpublic forum for public use. *Id.; Cornelius,* 105 S.Ct. at 3449. Second, "a State is not required to indefinitely retain the open character of" a designated public forum. *Perry,* 460 U.S. at 46, 103 S.Ct. at 955. Finally, a designated public forum may be so designated for only limited uses or for a limited class of speakers. *Id.* at 46 n. 7, 103 S.Ct. at 955 n. 7; *Cornelius,* 105 S.Ct. at 3449.

The forum at issue in *Cornelius* was a Federal program, known as the Combined Federal Campaign (CFC), established to regularize charitable solicitations among federal workers. Certain advocacy groups challenged their exclusion from the list of charities to which employees could designate CFC contributions, asserting that the CFC was a designated public forum from which they could not constitutionally be excluded.

The Court rejected the advocacy groups' contention. With respect to whether a designated public forum had been created, the Court stated:

> The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a non-traditional forum for public discourse. Accordingly, the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum. The Court has also examined the nature of the property and its compatibility with expressive activity to discern the government's intent. . . .

105 S.Ct. at 3449 (citations omitted).

Applying that standard, the Court looked first at the government's policy with respect to participation in the CFC. It noted that "[t]he Government's consistent policy has been to limit participation in the CFC to 'appropriate' voluntary agencies and to require agencies seeking admission to obtain permission from federal and local Campaign officials." *Id.* at 3450. The Court also noted that no showing had been made "that the granting of the requisite permission is merely ministerial." *Id.* at 3451.

The Court's conclusion that the CFC was not intended to be a public forum was strengthened by its examination of "the nature of the government property involved." *Id.* The court stressed particularly that the primary purpose of the government workplace is not communicative, and that the Government has a strong interest in exercising control over access to its workplace facilities. *Id.*

■ We do not think that the evidence in this case shows an intent by appellees to create a public forum at Arnold Field. The Board's policy requires each nonschool sponsored organization, such as SCP, to obtain permission to use the Field. *See* n. 1, *supra.* We agree with the district court that SCP has not met its burden of showing that such permission was in fact granted as a matter of course. Thus, neither the written policy nor the actual practice of the appellees manifests an intent to designate Arnold Field as a public forum. *Cf. Bender v. Williamsport Area School Dist.,* 741 F.2d 538, 548–49 (3d Cir.1984), *cert. granted,* —— U.S. ——, 105 S.Ct. 1167, 84 L.Ed.2d 319 (1985).

The nature of the property at issue in this case supports our conclusion. It has long been recognized that "First Amendment rights must be analyzed 'in light of the special characteristics of the school environment.'" *Widmar v. Vincent,* 454 U.S. 263, 268 n. 5, 102 S.Ct. 269, 273, 70 L.Ed.2d 440 (1981), *quoting Tinker v. Des*

*Moines Indep. School Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). The courts have never "suggested that students, teachers, or anyone else has an absolute constitutional right to use all parts of a school building or its immediate environs for his unlimited expressive purpose." *Grayned v. City of Rockford,* 408 U.S. 104, 117–18, 92 S.Ct. 2294, 2303–04, 33 L.Ed.2d 222 (1972). While an athletic field obviously differs from a school building, neither exists primarily for expressive activity, especially where large numbers of nonstudents are involved. This fact, while not dispositive, bolsters our conclusion that Arnold Field has not been designated as a public forum for community events.

### C.

■ As noted above, the decision to restrict access to a nonpublic forum must only be reasonable and not viewpoint based. In *Cornelius,* the Court found three bases for excluding the respondents from the CFC. First, the Court noted that charities providing direct aid to the needy could reasonably be supposed to be more beneficial than organizations primarily engaged in litigation. 105 S.Ct. at 3453. Second, the court noted that "avoiding the appearance of political favoritism is a valid justification for limiting speech in a nonpublic forum." *Id.* Finally, the Court found reasonable the government's asserted interest in "avoiding controversy that would disrupt the workplace and adversely affect the Campaign." *Id.*

Here, the district court found that the Board's denial of access to appellants was based on a desire "to keep the 'podium of politics off school grounds.'" The President of the Board testified that "[w]e don't want to become embroiled in political matters or have our facilities turn into political battlegrounds." This desire to avoid potentially disruptive political controversy and to maintain the appearance of neutrality, *see Lehman v. City of Shaker Heights,* 418 U.S. 298, 304, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974), is sufficient justification for excluding speakers from a nonpub-

lic forum. Although the Board's fears might have been unfounded, "the Government need not wait until havoc is wreaked to restrict access to a nonpublic forum." *Cornelius,* 105 S.Ct. at 3453.

Nor do we find unreasonable the Board's apparent view that the other activities permitted on Arnold Field posed less of a threat than the Peace Fair. While a Bike Hike to benefit the mentally retarded may have an implicit political message, that message is plainly subsidiary to other aspects of the event, and could thus pose less of a threat either of disruption or of the appearance of favoritism. The Board is not required to delineate with absolute clarity the distinction between the political and the nonpolitical, as long as the line it does draw is reasonable and not a subterfuge for viewpoint discrimination. In particular, the Board could reasonably conclude that Memorial Day services do not create the same risk of partisan controversy as the Peace Fair.

### D.

■ Finally, we affirm the district court's determination that appellees did not act from a desire to suppress expression with which they disagreed. Viewpoint discrimination, of course, is impermissible regardless of the nature of the forum. *Cornelius,* 105 S.Ct. at 3454. The district court found that SCP "did not produce any evidence that defendant sought to censor its point of view." We agree. Other than denying its request to use school facilities for the Peace Fair, appellees have not interfered in any way with SCP's other activities, including its activities on school grounds. Indeed, appellees were apparently willing to permit the Peace Fair to be held on school property, albeit in a facility that SCP found unacceptable. Nor was any evidence introduced that any individual Board members were personally hostile to SCP's political goals. While under some circumstances a disparity between the government's proclaimed justification for denying access to its property and its actual practice might be evidence of viewpoint

discrimination, *see Cornelius*, 105 S.Ct. at 3454–55, we find no significant disparity here.[5]

In conclusion, we affirm the district court's judgment with respect to SCP's claims under the First Amendment.

### III.

Following the district court's entry of judgment denying its request for a permanent injunction, SCP moved for reconsideration, arguing that the newly-enacted Equal Access Act, 20 U.S.C.A. §§ 4071 *et seq.* (Supp.1985) ("EAA" or "the Act"), gave it the right to hold the Peace Fair. The district court on reconsideration reaffirmed its denial of a permanent injunction. Although SCP did not amend its pleadings, the district court treated its motion as a claim under the Act, and it is not suggested that the district court acted improperly in so doing.

The Act, which became law in August 1984, provides in operative part:

> It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings.

EAA § 802(a), 20 U.S.C.A. § 4071(a). A "limited open forum" exists under the Act whenever a "school grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time." Id. § 802(b), 20 U.S.C.A. § 4071(b).

On this appeal we are faced with three questions, all of first impression. First, we must decide whether the Act authorizes a private cause of action by SCP. Second, assuming such a cause of action is authorized, we must decide whether the Act applies to student-initiated events involving nonstudents. Finally, we must decide whether the evidence presented to the district court, all of it relating to the period prior to the enactment of the Act, was sufficient to decide whether, within the meaning of the Act, a "limited open forum" had been created.[6]

### A.

We must first decide, as a threshold matter, whether the Act affords appellants rights that may be maintained through a private cause of action. This issue was not raised in the district court, but it is not suggested that it is not properly before us. Although the Act expressly provides that failure to abide by its terms shall not affect federal financial assistance, it does not by its terms provide any alternative mechanism for enforcement. Appellees argue that the statute merely declares Congress' interpretation of the First Amendment, and that consequently it creates no judicially enforceable rights or duties. Appellees' argument raises two questions, which we will treat separately: first, does the Act purport to create any enforceable rights and duties; and, second, if it does, may a private right of action be implied from the Act to enforce them?

■ As to the first question, we note that the statutory language is plainly mandatory rather than precatory. The operative words of the statute read: "It *shall be unlawful* ... to deny equal access ... to ... any students who wish to conduct a meeting." EAA § 802(a), 20 U.S.C.A. § 4071(a). Furthermore, Congress explicitly included in the Act both a severability clause, EAA § 804, 20 U.S.C.A. § 4073, and

---

5. Appellants contend that the Board's policies governing the use of school facilities are unconstitutionally vague and overbroad. They tacitly concede that they did not raise this issue in the district court. We are, therefore, not persuaded that we should address it, particularly since it is far from clear how appellants would benefit from a decision invalidating the school policies. See *Singleton v. Wulff*, 428 U.S. 106, 120–1, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976).

6. It is not disputed that LMHS receives federal financial assistance and is therefore in that respect subject to the Act.

a clause providing that "[t]he provisions of this subchapter shall supersede all other provisions of Federal law that are inconsistent with this subchapter." EAA § 805, 20 U.S.C.A. § 4074. These provisions would be unnecessary if the Act were not meant to create judicially enforceable obligations. The language of the Act, therefore, supports the view that it creates such obligations.

The legislative history supports the same conclusion. The Act was adopted in large measure to extend to secondary schools by legislative action the constitutional principle adopted by the Supreme Court in the university context in *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). *See* S.Rep. No. 357, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Ad.News 2348; 130 Cong.Rec. S8355 (daily ed., June 27, 1984) (remarks of Sen. Levin); *id.* at S8337 (remarks of Sen. Hatfield); *id.* at S8357 (remarks of Sen. Durenberger). In *Widmar,* the Court held that a state university that had created a limited open forum for student groups could not deny that forum to a student group wishing to use it for prayer and religious discussion, despite the university's contention that to permit students to use university facilities for religious purposes would violate the Establishment Clause.

Although the Court in *Widmar* expressly noted that its holding there did not necessarily apply in the secondary school context, *see* 454 U.S. at 274 n. 14, 102 S.Ct. at 276 n. 14, many members of Congress believed that secondary school students should enjoy the same constitutional rights as their older counterparts. In the absence of an authoritative Supreme Court pronouncement, however, the lower federal courts divided on the question. *Compare Brandon v. Guilderland Board of Educ.,* 635 F.2d 971 (2d Cir.1980) (holding that the Establishment Clause forbids student-initiated religious meetings on public secondary school property), *cert. denied,* 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981), *and Lubbock Civil Liberties Union v. Lubbock Indep. School Dist.,* 669 F.2d 1038 (5th Cir.1982), *cert. denied,* 459 U.S. 1155, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983) (same) *with Bender v. Williamsport Area School Dist.,* 563 F.Supp. 697 (M.D.Pa. 1983) (public forum doctrine requires schools to permit religious meetings), *rev'd,* 741 F.2d 538 (3d Cir.1984), *cert. granted,* — U.S. ——, 105 S.Ct. 1167, 84 L.Ed.2d 319 (1985).

In light of *Brandon* and *Lubbock,* and absent further guidance from the Supreme Court, Congress determined that legislative action was needed to "protect" and "guarantee" the rights of students. *See, e.g.,* S.Rep. 98–357, *supra;* 130 Cong.Rec. S8337 (daily ed. June 27, 1984) (remarks of Sen. Hatfield); *id.* at S8360 (remarks of Sen. Nickles). Some members, however, feared that protecting only religious speech would run afoul of the Establishment Clause. As a compromise measure, therefore, the statute was extended to protect "political, philosophical, or other" types of speech. *See id.* at 8336–37 (remarks of Sen. Hatfield).

Appellees point to statements by members of Congress during floor debate that the Act merely codified rights already available under the Constitution. *E.g., id.* at S8341 (remarks of Sen. Leahy); *id.* at S8355 (remarks of Sen. Levin). They conclude from this that the Act's strictures were not intended to be enforceable. In light of the legislative history set forth above, it is clear that Congress saw no inconsistency in enacting legislation intended to enforce already existing constitutional rights. Appellees' position is perhaps most seriously undermined by the fact that S.Rep. 357, *supra,* reporting on a bill containing *express* provisions for enforcement by private parties as well as the Attorney General—and thus undeniably mandatory—also speaks of the need to "clarify the nature of the First Amendment rights of students" and to "adopt legislation to guide school administrators, students, and parents." *Id.* at 2357–58.

Appellee's reliance on *Pennhurst State School v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), is misplaced. In *Halderman,* the Court held that the

"bill of rights" provision of the Developmentally Disabled Assistance and Bill of Rights Act of 1975, 42 U.S.C. § 6010 (1982), did not create substantive rights in favor of developmentally disabled persons. The Court held that that provision merely "express[es] a congressional preference for certain kinds of treatment." 451 U.S. at 19, 101 S.Ct. at 1540. Unlike the statute at issue here, which by its terms makes certain conduct "unlawful," section 6010 stated merely that "Congress makes the following *findings* respecting the rights of persons with developmental disabilities." *Id.* at 13, 101 S.Ct. at 1537 (emphasis added). Moreover, section 6010 was enacted as part of a larger funding statute, and could be given meaning as "justif[ying] and support[ing] Congress' appropriation of money under the Act and guid[ing] the Secretary in his review of state applications for federal funds," *id.* at 19; by contrast, the statute here is expressly independent of any funding scheme. *See* EAA § 802(e), 20 U.S.C. § 4071(e). Finally, the Court in *Halderman* found it unlikely that Congress would "implicitly impose[ ]" a "massive [financial] obligation" on the states; here, of course, compliance with the Act creates little or no fiscal burden. *See* letter of Rudolph G. Penner, Director, Congressional Budget Office, in S.Rep. 357, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Ad.News 2388.

We conclude, therefore, that the Act was intended to create enforceable duties and corresponding rights. We proceed, then, to the second question: whether students aggrieved by a violation of the Act may enforce their rights through a private cause of action.

 The Act, of course, does not specifically state whether a private cause of action may be maintained to enforce its provisions. However, this fact does not foreclose the possibility of an implied right of action. *See, e.g., Merrill, Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982); *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979);

*United States v. FMC Corp.*, 717 F.2d 775, 780–82 (3d Cir.1983).

As we noted in *FMC*, "the touchstone for the existence of an implied remedy is 'the intent of the legislature.'" *Id.* at 780, quoting *Middlesex County Sewerage Auth. v. National Sea Clammers Assn.*, 453 U.S. 1, 13, 101 S.Ct. 2615, 2622, 69 L.Ed.2d 435 (1981). The Supreme Court has normally looked at four factors in construing Congressional intent in this area: whether the language of the statute appears to create a special class of beneficiaries; the legislative history; the overall structure of the legislation; and whether the states have traditionally provided relief in the legislated area. *Cannon*, 441 U.S. at 688, 689–709, 99 S.Ct. 1952, 1953–1964; *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975).

 Our inquiry into Congress' intent is colored by the fact that the Equal Access Act lacks any express provisions for enforcement. By contrast, where the Supreme Court has found no implied private cause of action, the legislation at issue has invariably contained other express remedies. *E.g., National Sea Clammers*, 453 U.S. at 13–15, 101 S.Ct. at 2622–23; *California v. Sierra Club*, 451 U.S. 287, 294–95 & n. 6, 101 S.Ct. 1775, 1779–80 n. 6, 68 L.Ed.2d 101 (1981). The importance of this factor has been noted several times. For example, in *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), the Court stated that "it is an elementary canon of statutory construction that *where a statute expressly provides a particular remedy or remedies*, a court must be chary of reading others into it." 444 U.S. at 19, 100 S.Ct. at 246 (emphasis added). *See also Cannon*, 441 U.S. at 707 n. 41, 99 S.Ct. at 1963 n. 41. Conversely, the absence of any express remedial provision suggests that Congress intended for us to imply an appropriate remedy. We would be extremely reluctant to conclude that Congress intended to create mandatory duties but no means of enforcing them.

The first part of the *Cort* test requires us to consider "whether the statute was enacted for the benefit of a special class of which the plaintiff is a member." *Cannon*, 441 U.S. at 689, 99 S.Ct. at 1953. In doing so, we must consider especially whether the language of the statute suggests "an unmistakable focus on the benefited class," *id.* at 691, 99 S.Ct. at 1955, or merely a "ban on discriminatory conduct by recipients of federal funds." *Id.* at 692, 99 S.Ct. at 1955. In this respect the Equal Access Act is equivocal. While the operative language of the statute is phrased as a prohibition against discriminatory conduct, EAA § 802(a), 20 U.S.C.A. § 4071(a), it refers expressly to "any students who wish to conduct a meeting." Moreover, section 802(e) of the Act, 20 U.S.C.A. § 4071(e), suggests a primary intent to benefit that class by expressly disclaiming any intent to condition federal funding on compliance with the Act.

The legislative history of the Act is far less ambiguous. The author of the Act as written, Senator Hatfield, stated on the floor of the Senate that "[w]e provided here due process and an implied judicial remedy." 130 Cong.Rec. S8355 (daily ed., June 27, 1984). *See also* 130 Cong.Rec. H7740 (daily ed., July 25, 1984) (remarks of Cong. Schneider).[7] No statement in the legislative history suggests an intent to deny a private remedy.

The perceived parallel with *Widmar* is also instructive. As noted above, a guiding purpose of Congress was to remedy what it saw as the unwarranted refusal of the lower federal courts to extend that decision to secondary schools. A university student aggrieved by a denial of access to a limited public forum in violation of *Widmar* can, of course, enforce his rights through a § 1983 action. It can fairly be inferred that Congress intended the Act to be enforced in an analogous manner—that is, through actions brought by those directly injured by its violation.

We recognize that earlier versions of the Act contained express provisions for a private right of action that were dropped in the final version. *E.g.*, S. 1059, 98th Cong., 2d Sess. § 3 (1984); S. 815, 98th Cong., 1st Sess. § 2 (1983); *but see* H.R. 5345, 98th Cong., 2d Sess. (1984) (containing no such provision). This fact does, of course, suggest that no such right was intended, but that inference would be unwarranted here. First, we have no legislative history casting light on the significance of this redaction. Moreover, as noted above, the author of the final bill, Senator Hatfield, indicated that it retained an implied judicial remedy. Finally, the earlier bills provided for extensive remedies besides that of a private action, including a cut-off of Federal funds to noncomplying school districts and enforcement by the Attorney General. The drafters of those bills might have felt that in the absence of an express provision for a private right of action the funding cut-off would be interpreted as the exclusive remedy; once that remedy was dropped, expressly authorizing private actions may have been considered unnecessary.

We hold, therefore, that appellants may maintain a private cause of action for an injunction under the Equal Access Act.[8]

**B.**

The district court, relying on the fact that SCP seeks to invite nonstudents to the Peace Fair, rejected its statutory claim on the ground that "the Equal Access Act [does not] require[ ] that a public secondary school which receives Federal financial assistance must permit attendance of nonstudents in a limited public forum (as defined within the Equal Access Act) within the school." App. 36. After examining the legislative history of the Act, the court concluded that the Act should not be read to expand the rights of outsiders to enjoy school property. The court further held that the rights of students to invite the general public onto school premises are no

---

**7.** Remarks by the Act's opponents indicated concern that the Act would create "costly litigation." 130 Cong.Rec. H7728 (daily ed., July 25, 1984) (remarks of Rep. Edwards); *id.* at H7729 (remarks of Rep. Kastenmeier).

**8.** In view of this conclusion, we need not decide whether a section 1983 action may be brought to enforce the Act. *Cf. Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).

greater under the Act than under the First Amendment. App. 44. Appellees argue, in a somewhat different vein, that the Act only protects students who wish to meet on school property among themselves; thus, they assert, the Act can never apply where, as here, the affected student group desires to invite members of the general public onto school property.

We reject the broad contention that the Act does not apply to activities involving nonstudents. The only express reference to nonstudents in the Act is in section 802(c), 20 U.S.C. § 4071(c), which states that a school does not violate the equal access requirement "if such school uniformly provides that ... nonschool persons may not direct, conduct, control, or regularly attend activities of student groups."

Appellees argue that section 802(c) demonstrates that the Act applies only to activities involving students alone. The statutory language will not bear that construction. Indeed, its most natural reading is that if nonstudents do not direct, conduct, control, or regularly attend such meetings, the school may be required to permit their participation.

The legislative history supports the view that if the school's limited open forum includes nonstudent participation, then nonstudent participation must be permitted for all such student groups, subject only to reasonable, nondiscriminatory regulation. For example, the Senate Committee reporting on S. 1059, the Act's predecessor, stated that "the guarantee of equal access means that religiously oriented student activities of an extracurricular nature would be allowed *under the same terms and conditions as other extracurricular activities.*" S.Rep. 98–357, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Ad. News 2306, 2385 (emphasis added). The emphasis on equality of terms of access was reiterated in the floor debates. *See, e.g.,* 130 Cong.Rec. S8362 (daily ed., June 27, 1984) (remarks of Sen. Mitchell); *id.* H7739 (daily ed., July 25, 1984) (remarks of

Rep. Hall). That this principle applies to the participation of nonstudents is also clear from the statement of Senator Levin that "unless the school generally allows outsiders to participate in student meetings on school premises, this [Act] would not require the school to allow outsiders to participate in religious meetings." *Id.* S8355 (daily ed., June 27, 1984).

■ We conclude, therefore, that student groups wishing to invite nonstudents onto school property are protected by the Act if the school's limited open forum encompasses nonstudent participation in student events, as long as those nonstudents do not "direct, conduct, control, or regularly attend" such activities. A school is not, of course, required to permit any and all outsiders to use its facilities, or even to permit student groups indiscriminately to invite outsiders to its activities. However, the Act's purpose is to enable all students to use those facilities on the same terms as all other students.

## C.

■ The Equal Access Act was signed into law by the President on August 11, 1984. In the absence of any provision to the contrary, we consider the Act to be effective on the date of its enactment. *United States v. Gavrilovic,* 551 F.2d 1099, 1103 (8th Cir.1977). We read the Act to give affected school districts a choice: either to create a limited open forum open to all student groups on an equal basis, or to refuse access to all noncurricular student groups.[9] For this choice to be a real one, we think schools must be given the opportunity to choose with full knowledge of the consequences of each alternative. We believe it would be inconsistent with this principle for us to find that the appellees here had created a limited open forum under the Act before the Act's adoption, and thus before the choice could be a meaningful one. *Cf. Pennhurst State School v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981) ("legislation enacted pursuant to the spending power is much in

---

**9.** Since the Act only applies to schools receiving federal funds, a third choice is also available: to forego federal funding. *See Rosado v. Wyman,*

397 U.S. 397, 420–22, 90 S.Ct. 1207, 1221–22, 25 L.Ed.2d 442 (1970). That possibility, of course, does not concern us here.

the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' [Citations omitted.] There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it.").

The legislative history makes clear Congress' concern that the school districts affected by the Act retain the power to limit or completely deny noncurricular student meetings, as long as such restrictive policies are nondiscriminatory. *See, e.g.,* 130 Cong.Rec. S8338 (daily ed., June 27, 1984) (remarks of Sen. Dixon) ("The amendment specifies that the equal access provisions would be applicable only in cases where a school generally allows nonreligious student groups to meet during noninstructional time."); *id.* at S8357 (remarks of Sen. Durenberger) ("The Equal Access Act retains local school board control over its schools. The school board determines whether it will create a limited open forum by allowing student-initiated groups to meet on school premises."); *id.* at S8362 (remarks of Sen. Mitchell) ("The proposal does not force a school to organize any kind of extracurricular activity for any purpose.").

These considerations lead us to conclude that the Act should be read to apply only if a limited open forum existed after the Act became law. Since the trial in this case took place before the Act's effective date, there was no opportunity to offer evidence of the school's policy after that date. On remand, the appellants should have the opportunity to prove that the appellees' policy or practice *after* August 11, 1984 with respect to noncurricular student groups created a limited open forum broad enough to include the contemplated use.

The judgment of the district court will, therefore, be affirmed insofar as it dismiss-

es appellant's First Amendment claims. The judgment will be vacated with respect to appellant's claims under the Equal Access Act, and the case remanded to the district court for further proceedings consistent with this opinion.[10]

---

**10.** On remand, the District Court may wish to require the parties to formalize the Equal Access

Act claim through amended or supplemental pleadings.