**SAN DIEGO COMMITTEE AGAINST REGISTRATION AND THE DRAFT (CARD), Plaintiff-Appellant,**

v.

**The GOVERNING BOARD OF the GROSSMONT UNION HIGH SCHOOL DISTRICT, et al., Defendants-Appellees.**

No. 83–6070.

United States Court of Appeals, Ninth Circuit.

Submitted March 11, 1985.

Decided June 6, 1986.

Raphael Levens, San Diego, Cal., for plaintiff-appellant.

Daniel A. Nordberg, Fiore & Nordberg, Newport Beach, Cal., for defendants-appellees.

Before GOODWIN, WALLACE, and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

## I.  BACKGROUND

The San Diego Committee Against Registration and the Draft (CARD) appeals the district court's denial of its request for a preliminary injunction enjoining the Governing Board of Grossmont Union High School District (the Board) from enforcing certain policies, rules and regulations, pursuant to which the Board has rejected an anti-draft advertisement submitted by CARD for placement in a number of the district's student newspapers.[1]

CARD is a non-profit organization located in San Diego County, California that is actively involved in counseling young men on alternatives to compulsory military service.  CARD's membership consists of both students and non-students.  The Board is the governing body of the Grossmont Union School District and retains ultimate responsibility for the adoption and enforcement of policies, rules and regulations relating to administration of the district's schools, including policies affecting the student newspapers.

In October, 1982, CARD sought to purchase advertising space from five student newspapers published by high schools within the district.  According to CARD, its advertisement was directed toward providing information and counseling to male students regarding alternatives to military service.  CARD's requests were referred to faculty advisors for review and subsequently submitted to the principals of the five high schools.  The principals, in turn, requested Robert Pyle, Superintendent of the school district, to issue a policy guideline.

On November 8, 1982, Bob King, Acting Assistant Superintendent, issued a di-

---

**1.** The advertisement depicted a ghost-like figure, stating "Don't Let The Draft Blow You Away!" The following statements appeared below the figure:

Know Your Rights!
Know Your Choices!
If the draft starts tomorrow, you could be in boot camp 11 days later.
Call or Write:
Committee Against
Registration and the Draft
735–7518, 283–6878
P.O. Box 15195
San Diego, CA 92115

rective instructing all principals to reject CARD's requests on the ground that publication of the advertisements would contribute to the solicitation of illegal acts by the district's students.[2] On January 17, 1983, CARD filed an administrative claim with the Board in which it sought reversal of the Superintendent's decision. This claim was rejected on February 3, 1983.

On March 16, 1983, CARD brought suit against the Board pursuant to 42 U.S.C. § 1983 (1982), alleging that the Board's actions and policies had deprived CARD of its rights under the First and Fourteenth Amendments. CARD sought, *inter alia,* to enjoin the Board from enforcing those policies, rules and regulations that had resulted in the rejection of CARD's advertisements. CARD argued, as it does here, that because the Board permitted military service advertising, including various military recruitment advertisements, to be published in the five high school newspapers, it could not constitutionally exclude CARD's proffered advertisement.

The district court found that "[t]he student newspapers in the Grossmont High School District are limited in nature as a public forum." The district court also found that the military service advertisements that had appeared in the student newspapers were "non-political and offer[ed] vocational opportunities to the students." Finally, the district court found

that the Grossmont Union High School District policies permitting publication of political speech by students only and restricting newspaper access by non-students to commercial speech were "reasonable in light of the purpose of school publications." The district court concluded that CARD had failed to show either probable success on the merits of its claim or that it had raised a question that was sufficiently serious to warrant issuance of a preliminary injunction. In this appeal, CARD contends that the district court erred in concluding that it had failed to meet the higher standard— the probability of success on the merits. We agree, although we do not intend to suggest that meeting the lower standard— the raising of a serious question—would not have been sufficient to warrant the relief sought.[3]

## II. JURISDICTION

As a threshold matter, we address the Board's contention that we lack jurisdiction to hear this appeal as a result of CARD's failure to file its formal notice of appeal within the period of time prescribed by Fed.R.App.P. 4(a). In relevant part, Rule 4(a) provides that

[i]n a civil case in which an appeal is permitted by law as of right ... the notice of appeal ... shall be filed with the clerk of the district court within 30

---

2. In this appeal the Board advances several reasons for its refusal to permit publication of CARD's advertisement. CARD did not argue in the district court, nor does it argue here, that the Board is limited to relying on the reason Mr. King gave in rejecting CARD's ad. Accordingly, we do not consider whether, in responding to a First Amendment claim, the government may seek to justify its actions on grounds other than those relied upon at the time it acted. Instead, we assume for purposes of this case that it may.

3. Although it sometimes appears that there are two separate tests for the grant of a preliminary injunction, in fact there is only one, best described as a continuum in which the required showing of harm varies inversely with the required showing of meritoriousness. *See Benda v. Grand Lodge of the International Association*

*of Machinists,* 584 F.2d 308, 314–15 (9th Cir. 1978). The case before us turns on free speech rights under the First Amendment. The Supreme Court has noted that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.... The timeliness of political speech is particularly important." *Elrod v. Burns,* 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976) (plurality opinion) (citing *Carroll v. Princess Anne,* 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968)). *See also C.B.S. v. United States District Court,* 729 F.2d 1174, 1177 (9th Cir.1983) (mandamus petition: harm to First Amendment rights). Thus, given the type of serious harm claimed, CARD would still be entitled to an injunction even if it had made a lesser showing of meritoriousness than it actually did.

days after the date of entry of the judgment or order appealed from ....[4]

The provisions of Rule 4(a) are both mandatory and jurisdictional. *Browder v. Director, Illinois Department of Corrections,* 434 U.S. 257, 264, 98 S.Ct. 556, 560, 54 L.Ed.2d 521 (1978).

The district court entered an order denying CARD's request for a preliminary injunction on June 14, 1983. On June 24, 1983 rather than filing a notice of appeal pursuant to Rule 4(a), as it should have, CARD filed a motion for permission to appeal the order under Fed.R.App.P. 5(a). The latter rule provides that a district judge may certify an appeal from an order not otherwise appealable. The district court denied this motion on July 11, 1983. On July 19, 1983, CARD filed a Rule 4(a) notice of appeal.

■ Because CARD's formal Rule 4(a) notice of appeal was not filed within the period of time required by the rule, its appeal is timely only if we construe its Rule 5(a) motion as a notice of appeal. Fed.R.App. 3(c) requires us to construe CARD's Rule 5(a) motion in that manner. Rule 3(c) provides that "[a]n appeal shall not be dismissed for informality of form or title of the notice of appeal." Pursuant to this rule, we are required to broadly construe the notice of appeal provisions of Rule 4(a). *See Cel-A-Pak v. California Agricultural Labor Relations Board,* 680 F.2d 664, 667 (9th Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982) (Rule 3(c) mandates liberality in determining compliance with Rule 4(a)). Moreover, we have discretion, where the interests of substantive justice require it,

to disregard irregularities in the form or procedure for filing a notice of appeal. *Id.*

In *Cel-A-Pak,* we recognized that documents not formally denominated notices of appeal have nevertheless been treated as such "as long as they clearly evince the party's intent to appeal and provide notice to both the opposing party and the court." *Id.* (citations omitted). *See also Cobb v. Lewis,* 488 F.2d 41, 44 (5th Cir.1974). Here, CARD's Rule 5(a) motion, filed ten days after entry of the district court's order, provided clear notice to both the court and the Board that CARD intended to appeal the order. Accordingly, we construe this motion as a Rule 4(a) notice of appeal which we find to have been timely filed.[5]

## III. THE PUBLIC FORUM DOCTRINE AND THE FIRST AMENDMENT

CARD contends, in essence, that because others' advertisements relating to military service were published in several Grossmont high school newspapers, the Board could not exclude CARD's advertisement, particularly since CARD's advertisement presented an opposing viewpoint to the position taken in the previous ads.

The values embodied in the First Amendment require the state, under certain circumstances, to provide members of the public with access to its facilities for purposes of speech. Certain state facilities, which may be appropriately used for communication, enjoy special constitutional status as "public forums." *See generally Cornelius v. NAACP Legal Defense & Educational Fund,* —— U.S. ——, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *Perry Edu-*

---

4. Appeals from a district court's interlocutory order "granting, ... refusing or dissolving injunctions" are permitted by law as of right. 28 U.S.C. § 1292(a).

5. We find this case clearly distinguishable from *Selph v. Council of the City of Los Angeles,* 593 F.2d 881 (9th Cir.1979), in which this court rejected appellant's contention that its motion to extend the period of time in which to appeal should be construed as a notice of appeal. In *Selph,* the motion for an extension had been made 40 days after the entry of judgment. Thus, even if the court had construed appellant's motion for an extension of time as a

notice of appeal, the motion would not have been timely. The court therefore rejected appellant's contention, concluding that "this Court has no authority under Rule 4(a) to extend the [30–day period of] time for filing a notice of appeal." *Id.* at 883. Here, appellant's Rule 5(a) motion was made 10 days after entry of judgment, and thus within the period of time provided under Rule 4(a). Unlike the court in *Selph,* we are not being asked to extend the 30–day time limit imposed by Rule 4(a). Accordingly, we do not find *Selph* to be of any relevance here.

*cation Association v. Perry Local Educators' Association,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). In these public forums, the First Amendment narrowly circumscribes the government's power to exclude or regulate speech. Of course, a state's mere ownership or control of a facility does not, in itself, guarantee access under the First Amendment. *United States Postal Service v. Council of Greenburgh Civic Associations,* 453 U.S. 114, 129–30, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981). Similarly, merely permitting public access to a government facility does not necessarily open it for use as a public forum. *Greer v. Spock,* 424 U.S. 828, 836, 96 S.Ct. 1211, 1216, 47 L.Ed.2d 505 (1976). However, even with respect to nonpublic forums, the state may not act unreasonably. *Cornelius,* 105 S.Ct. at 3448.

In *Perry* and *Cornelius,* the Supreme Court identified three types of forums to which the public's right of access varies, as does the type of limitations the state may impose upon the right. The Court first focused on "places which by long tradition or by government fiat have been devoted to assembly and debate," such as streets and parks, where "the rights of the state to limit expressive activity are sharply circumscribed." *Perry,* 460 U.S. at 45, 103 S.Ct. at 954; *accord Cornelius,* 105 S.Ct. at 3449. The Court stated that

> [i]n these quintessential public forums, the government may not prohibit all communicative activity. For the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. The state may also enforce regulations of the time, place and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.

*Perry,* 460 U.S. at 45, 103 S.Ct. at 955 (citations omitted); *accord Cornelius,* 105 S.Ct. at 3448–49.

The second type of public forum on which the Court focused consists of "public property which the State has opened for use by the public as a place for expressive activity." *Perry,* 460 U.S. at 45, 103 S.Ct. at 955; *accord Cornelius,* 105 S.Ct. at 3449. The courts have come to call this type of public forum a "limited public forum" or a "public forum by designation." In such a forum, "[t]he Constitution forbids a state to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place." *Perry,* 460 U.S. at 45, 103 S.Ct. at 955; *accord Cornelius,* 105 S.Ct. at 3449. A limited public forum may, depending on its nature and the nature of the state's actions, be open to the general public for the discussion of all topics, or there may be limitations on the groups allowed to use the forums or the topics that can be discussed. Thus, a limited public forum may be open to certain groups for the discussion of any topic, *Perry,* 460 U.S. at 46 n. 7, 103 S.Ct. at 955 n. 7 (citing *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981)), or to the entire public for the discussion of certain topics, *Perry,* 460 U.S. at 46 n. 7, 103 S.Ct. at 955 n. 7 (citing *City of Madison Joint School District v. Wisconsin Employment Relations Comm'n,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976)), or some combination of the two.

Once the state has created a limited public forum, its ability to impose further constraints on the type of speech permitted in that forum is quite restricted:

> [a]lthough a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum. Reasonable time, place and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest.

*Perry,* 460 U.S. at 46, 103 S.Ct. at 955 (citations omitted). "Thus the identical broad free speech rights attach to the first and second types of public forums," *Cinevision Corp. v. City of Burbank,* 745 F.2d

560, 569 (9th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2115, 85 L.Ed.2d 480 (1985); *accord Cornelius,* 105 S.Ct. at 3448, although in the latter type of forums those broad rights apply only within the particular boundaries of the specific forum that has been established.

The third type of forum is "[p]ublic property ... which is not by tradition or designation a forum for public communication," *Cinevision,* 745 F.2d at 569 n. 8 (quoting *Perry,* 460 U.S. at 46, 103 S.Ct. at 955), such as a military base or jail. The Court recognized that this type of forum is governed by standards different from those applicable to the first two. The Court stated that

> [i]n addition to time, place and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is *reasonable.*

*Perry,* 460 U.S. at 46, 103 S.Ct. at 955 (emphasis added); *accord Cornelius,* 105 S.Ct. at 3448. "The existence of reasonable grounds for limiting access to a nonpublic forum, however, will not save a regulation that is in reality a facade for viewpoint-based discrimination." *Cornelius,* 105 S.Ct. at 3454.

## IV. SCHOOL NEWSPAPERS AS A LIMITED PUBLIC FORUM

The Board first contends that the school newspapers fall into the third category of forums, non-public forums. We disagree, and hold that the newspapers fall into the second category, limited public forums. In deciding whether a particular forum is a limited public forum or a nonpublic forum, we must determine what type of forum the government intended to create. *Cornelius,* 105 S.Ct. at 3449. The government's

intent is evidenced by "[its] policy and practice ... [as well as] the nature of the property and its compatibility with expressive activity." *Id.*

In the case before us, the evidence clearly indicates an intent to create a limited public forum. Newspapers, including the Board's, are devoted entirely to expressive activity. Everything that appears in a newspaper is speech, whether commercial, political, artistic, or some other type. It is difficult to think of any other kind of property that is more compatible with expressive activity. In addition, the admitted policy and practice of the Board is to allow a particular group—the students—to discuss any topic in the newspapers, subject only to certain conditions not relevant to the issues before us. Thus, under the test enumerated in *Cornelius,* the Board's newspapers, like most other school papers, constitute, at a minimum, a limited public forum of the type found in *Widmar. See supra* pp. 1475–76.

The Board also allows non-students to use the forum it has created in the newspapers. The Board's admitted policy and practice is to allow members of the general public to avail themselves of the forum as long as their speech consists of advertisements offering goods, services, or vocational opportunities to students. Because the newspapers are open to the entire public for the discussion of these limited topics, the Board has also created a limited public forum of the type found in *City of Madison. See supra* pp. 1475–76.[6]

As a result, the dispute between the Board and CARD reduces itself to a debate over the precise limitations on the topics that may be discussed by non-students in the limited public forum the Board has created. The Board argues that it permits

---

**6.** The Board's reliance on *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) is misplaced. At issue in *Perry* was the validity of a collective bargaining agreement between the school district and the teachers' exclusive bargaining representatives which provided the bargaining representative with exclusive access to teacher mailboxes, thereby excluding the petitioner, a rival union. The Court observed that the school

had not held the mail distribution system open to the general public. Rather, the school had, with few exceptions, restricted its use to official business: the communication of school-related matters to teachers. Thus, use of the system by an organization affiliated with the school—such as the recognized teachers' union—did not render the system a limited public forum. Here, unlike *Perry,* the Board has provided outside entities with access to its newspapers.

non-students to engage only in non-political commercial speech in the newspapers. It claims that the military service advertisements were non-political, but that CARD's ad is not. The district court, agreed with the Board and found that the military service advertisements published in the newspapers (1) offered vocational or career opportunities to students and (2) were non-political.

We agree with the first part of the district court's finding but disagree with the second. The advertisements regarding military service career opportunities are different from most career ads in several important respects. First, most career ads are commercial in nature. They involve the advertiser's "economic interests." *Central Hudson Gas & Electric Co. v. Public Service Commission,* 447 U.S. 557, 561, 100 S.Ct. 2343, 2348, 65 L.Ed.2d 341 (1980). The "commercial speech" doctrine "rests heavily on the 'common sense' distinction between speech proposing a commercial transaction and other varieties of speech." *Zauderer v. Office of Disciplinary Counsel,* —— U.S. ——, 105 S.Ct. 2265, 2275, 85 L.Ed.2d 652 (1985) (quoting *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 455–56, 98 S.Ct. 1912, 1918–19, 56 L.Ed.2d 444 (1978)). Here, the government's interest in promoting military service is not an economic one; it is essentially political or governmental. Nor is any commercial transaction being proposed.

Second, it has long been recognized that the subject of military service is controversial and political in nature. There has been opposition to military service, both compulsory and voluntary, throughout our nation's history. *See, e.g., United States v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) (discussing history of conscientious objection). Opposition to compulsory service—the draft—is often simply a manifestation of a more deeply rooted opposition to military service in any form. *See, e.g., Wayte v. United States,* —— U.S. ——, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985); *Welsh v. United States,* 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970); *Sicurella v. United States,* 348 U.S. 385, 75 S.Ct. 403, 99 L.Ed. 436 (1955). The controversy over military service led to student protests in the late 1960's and early 1970's. Many of our nation's finest universities and colleges barred military recruiters from their campuses and terminated the Reserve Officer Training Corps programs they had previously offered. For other manifestations of the controversy over voluntary and involuntary military service, *see, e.g., In re Summers,* 325 U.S. 561, 65 S.Ct. 1307, 89 L.Ed. 1795 (1945) (attorney could properly be denied admission to state bar because of his opposition to military service); *United States v. Schwimmer,* 279 U.S. 644, 49 S.Ct. 448, 73 L.Ed. 889 (1929) (alien could properly be denied citizenship due to opposition to military service); *United States v. Macintosh,* 283 U.S. 605, 51 S.Ct. 570, 75 L.Ed. 1302 (1931) (same); *United States v. Bland,* 283 U.S. 636, 51 S.Ct. 569, 75 L.Ed. 1319 (1931) (same); *Girouard v. United States,* 328 U.S. 61, 66 S.Ct. 826, 90 L.Ed. 1084 (1946) (overruling *Schwimmer, Macintosh,* and *Bland* ).

One need not agree with those opposed to military service in order to recognize the fact that there is indeed a well-established and continuing controversy surrounding the subject. The ads sponsored by the military advanced the position taken by the proponents of one side to that political dispute. Accordingly, the district court erred when it found that the military recruitment advertisements were non-political.[7]

---

**7.** One of the district newspapers, the *Foothill Echoes* of Grossmont High, also ran an ad sponsored by the Selective Service System Registration Information Bureau which read as follows:

A Reminder from
SELECTIVE SERVICE
If you are a male citizen
or alien residing in the U.S., you
must register with Selective Service
within 30 days of your 18th
birthday.
If you were born in 1960, 61,
62 or 63 you should already
have registered. If you have not,
you should do so as soon as possible.
You may register at any

Thus, the Board has allowed certain members of the public—various military recruiters—to use its newspapers to engage in speech that is not essentially commercial in nature but that combines elements of political and commercial speech. As a result, the Board's *actual* policy and practice leads, under *Cornelius,* to the conclusion that the Board has established the school newspapers as a limited public forum in which students can discuss any topic, and in which non-students can engage in commercial speech generally and in speech which is both political and commercial with respect to at least one important and highly controversial topic—military service. Because the Board on a number of occasions permitted the publication of advertisements advocating military service, there can be no question but that the Board intended to open the newspapers for advertisements on this topic—at least by one side to the debate.

CARD's advertisement comes within the boundaries of the limited public forum the Board has created. Having established a limited public forum, the Board cannot, absent a compelling governmental interest, exclude speech otherwise within the boundaries of the forum. *See supra* pp. 1475–1476. In particular, the Board cannot allow the presentation of one side of an issue, but prohibit the presentation of the other side. *City of Madison,* 429 U.S. at 175–76, 97

S.Ct. at 426–27. Here, the Board permitted mixed political and commercial speech advocating military service, but attempted to bar the same type of speech opposing such service.[8] The Board has failed to advance a compelling governmental interest justifying its conduct. Accordingly, the Board violated the First Amendment when it excluded CARD's advertisements from the newspapers.[9]

## V. NONPUBLIC FORUMS

In the alternative, we hold that even if the Board is correct in its assertion that the school newspapers are a nonpublic forum, its conduct still violated the First Amendment because its refusal to accept CARD's ads was unreasonable and constitutes viewpoint-based discrimination.

### A. *Reasonableness Test*

#### 1. *Generally*

The Board claims that its exclusion of CARD from the newspapers was reasonable and therefore constitutional, and offers three arguments in support of this conclusion. First, the Board claims that pursuant to the District's Publications Code, the Board may, in its discretion, restrict publication of ads proffered by non-student entities to non-political advertisements offering goods, services or vocation-

---

U.S. Post Office
Selective Service System
Registration Information Bureau
Washington, D.C. 20435

This ad also relates to a political and controversial question, but we cannot rest our holding on it here because, while CARD is seeking an injunction against all five of the student newspapers, the ad appeared in only one.

**8.** The advertisement at issue offers counseling *services* regarding involuntary military service. The ad also takes a position on the desirability of military service. Thus, the anti-military service ad is of a mixed political and commercial character in the same way or to the same extent that the pro-military service ads are. We do not mean to imply, however, that an advertisement opposing military service but not offering goods, services, or vocational opportunities would fall outside the boundaries of the limited public forum that has been created. The issue

whether, having opened a forum for mixed political and commercial speech on a particular topic, the state may bar a response that constitutes pure political speech is not before us and we do not reach that question.

**9.** The dissent argues that our holding that the newspapers are limited public forums is inconsistent with *Student Coalition for Peace v. Lower Merion School District,* 776 F.2d 431 (3d Cir. 1985). We do not agree. In *Student Coalition,* the Third Circuit held that a school athletic field's traditional classification as a nonpublic forum remained appropriate despite the occasional use of the field for other purposes. The court noted that access to the field for non-athletic purposes was highly restricted and was not granted as a matter of course. As discussed above, the facts of the case before us are entirely different. We see little similarity—in their fundamental purposes—between a school baseball diamond and a school newspaper.

al opportunities to students. Second, the Board urges that its refusal of CARD's advertisement was lawful because publication of the ad would have amounted to advocacy of an illegal act. Third, the Board claims, relying principally on its Publications Code, that because publication of CARD's advertisement would have necessarily reduced the space available to students to express themselves, the rejection of the ad was lawful.

### 2. *Political Nature of the Ads*

We have already demonstrated the fallacy in the Board's first argument. As discussed above, p. 1477, the military recruitment advertisements were of a mixed political and commercial character. CARD's ad pertained to the same topic, and like the recruitment ads, offered goods, services, or vocational opportunities to students. *See supra* note 8. Because CARD's ad dealt with the same politically controversial topic as previously-published ads, the political character of the ad did not provide a reasonable basis for excluding it from the newspapers.

### 3. *The Threat of Illegal Conduct*

The Board urges the prospect of illegal conduct as a reason not to publish CARD's advertisement. In the Board's view, its publication would amount to advocacy of non-registration—an illegal act.

We agree, of course, that the Board has a strong interest in promoting law abiding conduct among its students. But we are unable to conclude that its prohibiting the publication of CARD's advertisement serves this interest. The Board bases its argument on the fact that the organization has styled itself "The Committee Against Registration and the Draft." The Board further contends that the advertisement, when viewed in its entirety, advocates non-registration.

That the organization's name implies opposition to a particular law is not, in our view, sufficient to support a conclusion that the organization advocates unlawful conduct. Moreover, there is nothing in the text of the advertisement suggesting that CARD encourages non-registration. *See supra*, note 1. In fact, the record discloses that according to Superintendent Pyle the Board had no evidence that the purpose of the advertisement was to stop students from registering, and that the Board had derived such intent solely from a reading of the organization's name.

It is true that a state may act to prohibit individuals from advocating violations of the law when such advocacy is directed toward inciting or producing imminent lawless action and is likely to accomplish that objective. *See Brandenberg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969). "But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969). Mere speculation on the part of the state that individuals might at some time engage in illegal activity is insufficient to justify regulation. *Gay Students Organization v. Bonner*, 509 F.2d 652, 662 (1st Cir.1974).

The Board's conclusion that publication of CARD's advertisement would result in unlawful conduct was, at best, speculative. The record is devoid of any evidence that CARD advocated illegal conduct or that publication of the advertisement was likely to give rise to such conduct. To the contrary, the record indicates that CARD, through its advertisement, sought to apprise eligible students of legitimate and lawful alternatives to the draft, such as the availability of student deferments. Accordingly, we conclude that the Board's fear of illegal advocacy did not provide a reasonable basis for excluding CARD from the newspapers.

### 4. *Reduction of Opportunities*

Finally, the Board contends that its refusal to publish CARD's advertisement is justified by its interest, reflected in its Publications Code, in providing its students with a forum for free expression. The

Board claims that excluding material written or sponsored by outsiders such as CARD from its student newspapers increases the students' opportunities to express themselves in print. We acknowledge, and the parties do not dispute, that the Board may, in light of various practical constraints, prohibit or impose limits on the amount of material from non-students that may be published in student newspapers. However, any such restriction may not be arbitrary or unreasonable. *See Cornelius.* The Board has offered no valid reason that distinguishes the reduction in student opportunities for freedom of expression due to publication of the recruitment ads from the reduction that would occur from publication of CARD's advertisement; nor does the Board suggest that there is any objective system for limiting the number of ads or choosing among ads concerning the same general subject or relating to the

same type of service or vocation. The differentiation in treatment between CARD's ad and the military's was thus arbitrary and as a result impermissible. Accordingly, we hold that the Board's policy on student self-expression did not provide a reasonable basis for excluding CARD from its newspapers.

### 5. *Conclusion*

The Board has failed to advance any reasonable grounds for excluding CARD's advertisement from the newspapers.[10] Accordingly, even if we assume that the newspapers are a nonpublic forum, that is, the type of forum which receives the least protection under the First Amendment, we must conclude that the Board violated the guarantees of that amendment when it prevented the publication of CARD's advertisement. *See Cornelius*, 105 S.Ct. at 3448.[11]

**10.** Our dissenting colleague argues that the Board could reasonably exclude CARD from the newspapers on the ground that publication of the advertisement would cause disruption in the schools. The Board did not advance that reason before this court, and thus it would not be proper for us to consider it. Furthermore, there is nothing in the record to suggest that the ad, if published, would have disrupted the schools. Finally, and most important, the Supreme Court has made it clear that "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression" in the schools. *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969). The dissent cites *Cornelius* in support of its conclusion, but in *Cornelius* the claims of possible disruption were well-documented in the record. 105 S.Ct. at 3453–54. Thus, the dissent is unable to advance a valid reason in support of the Board's actions.

**11.** The dissent argues that our holding that the Board's restrictions are not reasonable is contrary to those of *Cornelius* and *Student Coalition for Peace v. Lower Merion School District*, 776 F.2d 431 (3d Cir.1985). We disagree. In *Cornelius*, the Supreme Court held that the government could reasonably exclude all "political" charities from participation in a federal charity drive in order to prevent disruption of the workplace and to maintain an appearance of neutrality. In the case before us, the Board has not excluded all politically controversial ads, there is no claim of disruption, and the Board's publi-

cation of only one side of a highly controversial issue has destroyed any appearance of neutrality. Thus, *Cornelius* is perfectly consistent with our holding here.

In *Student Coalition*, the Third Circuit held that a school district could properly exclude a "peace fair" from school grounds, even though it had in the past permitted memorial services for war dead, as well as certain activities for disabled and mentally retarded children, to take place on those grounds. The court held that the school board could reasonably conclude that the "peace fair" would be highly political and controversial, and that the memorial services and other charitable events were not. Similarly, the court found that any political implications relating to activities benefitting the disabled and mentally retarded were minimal at most. This is consistent with the Supreme Court's view of the federal charity drive in *Cornelius*. Thus, the Third Circuit held, no prior political activities had been conducted on the school grounds and, in order to avoid permitting the use of school facilities for political purposes, the school district could properly exclude the "peace fair." The court stated that the school board was "not required to delineate with absolute clarity the distinction between the political and the nonpolitical, as long as the line [drawn] is reasonable and not a subterfuge for viewpoint discrimination." 776 F.2d at 437.

The school board's line-drawing in *Student Coalition* was more than reasonable. A memorial service, like a charity drive or activities for the disabled and mentally retarded, is normally not political or controversial; even persons who

## B. *Viewpoint-Based Discrimination*

Furthermore, it appears that the Board was engaging in viewpoint-based discrimination. By allowing the publication of the military recruitment advertisements, the Board allowed the presentation of one side of a highly controversial issue. The Board provided a forum to those who advocate military service. The Board then refused, without a valid reason, to allow those who oppose military service to use the same forum. The only reasonable inference is that the Board was engaging in viewpoint discrimination. As the Supreme Court has stated, "[t]o permit one side of a debatable public question to have a monopoly in expressing its views ... is the antithesis of constitutional guarantees." *City of Madison*, 429 U.S. at 175–76, 97 S.Ct. at 426–27. In other words, "the First Amendment means that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 65, 103 S.Ct. 2875, 2879, 77 L.Ed.2d 469 (1983) (quoting *Police Department of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2289–90, 33 L.Ed.2d 212 (1972)). Viewpoint-based discrimination is not permitted even in a non-public forum. *Cornelius*, 105 S.Ct. at 3554. Accordingly, the Board's viewpoint discrimination provides a second ground for holding that even if the school newspapers do not constitute a public forum, the Board violated the First Amendment in excluding CARD's advertisement.

## VI. CONCLUSION

Because CARD has shown a substantial likelihood that it will prevail on the merits of its claim, we conclude that the district court abused its discretion in denying CARD's request for a preliminary injunc-

oppose war are willing to mourn those who have died in our nation's service. While it is true that in unique circumstances a particular memorial service for war dead may be political and controversial, *viz* the visit of President Reagan to Bitburg where members of the Nazi S.S. are interred, *Student Coalition* did not involve services that were political or controversial in any respect.

tion. We remand the matter and, pending trial on the merits, instruct the district court to enter a preliminary injunction in favor of CARD.

REVERSED AND REMANDED.

WALLACE, Circuit Judge, dissenting:

I first address a preliminary problem with the majority disposition. I believe the majority is far too generous in considering a document which does not purport to be a notice of appeal as complying with Fed.R. App.P. 4(a). I cannot distinguish *Selph v. Council of the City of Los Angeles*, 593 F.2d 881 (9th Cir.1979), from this case and, therefore, conclude we have no jurisdiction to hear this appeal.

If this were the only vice of the majority disposition, my separate opinion would be brief. But the majority has run afoul of Supreme Court precedent on a fundamental issue. Last Term, in *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, —— U.S. ——, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) (*Cornelius*), the Court presented its most thorough elaboration of the public forum doctrine. *See id.* at 3446–55. Unfortunately, the majority misreads or disregards *Cornelius* and manufactures an analysis that is patently inconsistent with the analysis of the Court.

### I

In *Cornelius*, the Court addressed a claim that the federal government violated the first amendment by excluding legal defense and political advocacy organizations from participation in the Combined Federal Campaign (the campaign), a charity drive conducted in the federal workplace. An executive order limited participation in the campaign to "voluntary, charitable, health

In the case before us, the Board's actions cannot be described as reasonable. The fact that absolute clarity in line-drawing is not required does not mean that all line-drawing is per se permissible. The Board has permitted the newspapers to carry politically controversial ads. Therefore, as discussed above, it cannot exclude other ads merely because their content is political.

and welfare agencies that provide or support direct health and welfare services to individuals or their families" and specifically excluded organizations that seek to influence elections or public policy through political activity, lobbying, or litigation. *Id.* at 3445–46, *quoting* Exec. Order No. 12404 § 1(b), 3 C.F.R. 151 (1984). After acknowledging that charitable solicitation of funds is a form of protected speech, *id.* at 3447–48, the Court turned to examine the status of the campaign under the public forum doctrine. Following *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 45–46, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983) (*Perry*), the Court recognized three categories of fora: (1) the traditional public forum; (2) the public forum created by government designation, which includes the "limited public forum"; and (3) the nonpublic forum. 105 S.Ct. at 3449.

The Court determined that the campaign was a nonpublic forum, rather than a public forum created by government designation. The key to distinguishing between these two categories, the Court ruled, is the *government's intent:*

The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a non-traditional forum for public discourse. Accordingly, the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum.

*Id.* (citation omitted). Thus, the Court observed, the internal mail system in *Perry* was a nonpublic forum since "school board policy did not grant general access to the school mail system." *Id.* at 3450; *see Perry,* 460 U.S. at 47, 103 S.Ct. at 956 (forum is nonpublic if there is no policy or practice of "indiscriminate use by the general public"). Similarly, the advertising space on city transit buses in *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), was a nonpublic forum because the city's policy of allowing only commercial and not political advertisements showed that it intended to limit access. *Cornelius,* 105 S.Ct. at 3450.

Applying this intent test, the Court explicitly rejected the contention that the campaign was a limited public forum open to all charitable organizations. The Court stated that the government's policy and practice of limiting access to the campaign precluded the conclusion that the campaign had been purposefully designated for public use. The Court also observed that the nature of the government property involved is relevant to determining intent and that the government has the right to control access to the workplace to avoid disruption. Consequently, the selective access granted to certain charitable organizations did not convert the campaign into a public forum. *Id.* at 3450–51.

Because the campaign was a nonpublic forum, the Court subjected its restrictions to limited scrutiny: "Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Id.* at 3451; *see Perry,* 460 U.S. at 46, 49, 103 S.Ct. at 954, 957. The Court found the restrictions on access reasonable since they were intended to avoid "the appearance of political favoritism" and to limit disruption of the forum. *Cornelius,* 105 S.Ct. at 3453–54. The Court remanded the case, however, because the lower courts had not made a finding on whether the restrictions were "in reality a facade for viewpoint-based discrimination." *Id.* at 3454–55.

The proper application of *Cornelius* is well illustrated by *Student Coalition for Peace v. Lower Merion School District Board of School Directors,* 776 F.2d 431 (3d Cir.1985) (*Student Coalition*). In *Student Coalition,* the Third Circuit encountered a fact situation closely analogous to this case. Indeed, the few differences that exist make ours an even stronger case for the application of *Cornelius.* Student Coalition for Peace (SCP), a nonschool-spon-

sored student organization dedicated to the cause of world peace through nuclear disarmament, requested permission to use Arnold Field, an athletic field on school premises, for a Peace Fair. The field had been regularly used for nonschool-sponsored community events, including annual Memorial Day services honoring the nation's war dead. The field was also used regularly without permission by members of the community for recreational purposes. The school board denied the student group permission to use the field for the Peace Fair on the ground that the field was not available for political events. The student group brought suit, claiming that the public forum doctrine required that it be granted use of the field. *Id.* at 433–34.

The Third Circuit, adhering closely to the guidance provided by the Supreme Court in *Cornelius*, determined that the field was a nonpublic forum:

> We do not think that the evidence in this case shows an intent by appellees [ (the school board and other school officials) ] to create a public forum at Arnold Field. The Board's policy requires each nonschool sponsored organization, such as SCP, to obtain permission to use the Field.... SCP has not met its burden of showing that such permission was in fact granted as a matter of course. Thus, neither the written policy nor the actual practice of appellees manifests an intent to designate Arnold Field as a public forum.

*Id.* at 436. The court then concluded that limiting the field to non-political events was reasonable in light of the "desire to avoid potentially disruptive political controversy and to maintain the appearance of neutrality." *Id.* at 437. Significantly, the court recognized that while other activities permitted on the field

> may have an implicit political message, that message is plainly subsidiary to other aspects of the event, and could thus pose less of a threat either of disruption or of the appearance of favoritism. The Board is not required to delineate with absolute clarity the distinction between

the political and the nonpolitical, as long as the line it does draw is reasonable and not a subterfuge for viewpoint discrimination. In particular, the Board could reasonably conclude that Memorial Day services do not create the same risk of partisan controversy as the Peace Fair.

*Id.* Accepting the district court's finding of no viewpoint discrimination, the court denied SCP's first amendment claim. *Id.* at 437–38.

## II

The majority concludes that the appearance of vocational military advertisements in the five student newspapers published by high schools governed by the Board created limited public fora from which CARD's advertisement could not be excluded. I believe that the majority, while purporting to apply *Cornelius*, ignores its teachings.

As I read *Cornelius*, the Board's acceptance of the vocational military advertisements in the five high school newspapers did not create limited public fora from which CARD's advertisement could not be excluded. The fora that we must address consist of the advertising spaces in the five papers. *See Cornelius*, 105 S.Ct. at 3449 (defining forum according to access sought by speaker). These fora are public only if the Board has purposefully designated them for public discourse. *See id.; see also Calash v. City of Bridgeport*, 788 F.2d 80, 83 (2d Cir.1986) ("not every possible vehicle for communication is a public forum"). "[S]elective access, unsupported by evidence of a purposeful designation for public use, does not create a public forum." *Cornelius*, 105 S.Ct. at 3451.

I see no indication that the Board intended to designate the advertising spaces in the five high school newspapers as public fora. As in *Perry, Lehman,* and *Cornelius,* the Board's policy and practice do not demonstrate an intention to grant general access to the newspapers' advertising space. On the contrary, the Board's policy states, in part, that "paid advertisements by nonstudents ... shall not be published

except ... [i]nsofar as the publication staff and adviser in their sole discretion determine that the publication of such material will further the publication's primary purposes sufficiently to warrant publications ...." Further, as a matter of practice, the Board developed criteria limiting access to the advertising space.

The nature of the government property involved in this case bolsters the conclusion that the Board did not intend to designate the newspapers' advertising spaces as public fora. I believe that the advertising spaces in the five high school newspapers exist not to promote the expressive activity of nonstudents but rather to teach students journalistic management skills and to help finance the publication of the newspapers. See Nicholson v. Board of Education Torrance Unified School District, 682 F.2d 858, 863–64 (9th Cir.1982) (Nicholson). This enterprise is inconsistent with an intent to designate the advertising space as a public forum. See Cornelius, 105 S.Ct. at 3450 (discussing Lehman). Moreover, our obligation to apply first amendment rights "in light of the special characteristics of the school environment," Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969), requires that we accept "school policies that are reasonably designed to adjust those rights to the needs of the school environment." Nicholson, 682 F.2d at 863. The Board has the right to control access to the newspapers' advertising spaces in order to avoid disruption of the educational process. See Cornelius, 105 S.Ct. at 3451; Student Coalition, 776 F.2d at 436–37. Cornelius therefore requires the conclu-

sion that the newspapers' advertising spaces are nonpublic fora.

The majority's contrary conclusion rests on its mistaken belief that if speech admitted in a forum relates to a "controversial and political" issue, the government has created a limited public forum that encompasses the issue. See maj. op. at 1477–1478. That the majority's test conflicts with the Supreme Court's government intent test in Cornelius is evident from applying the majority's test to the issues addressed in Cornelius and Student Coalition. If the majority's term "controversial and political" has any discernible fixed meaning, it surely encompasses the provision of health and welfare services (Cornelius) and the subject of war and peace (Student Coalition). Since charitable organizations soliciting in the campaign in Cornelius engage in speech on a controversial and political issue, an evenhanded application of the majority's test would determine that the campaign is a limited public forum from which legal defense and political advocacy organizations could not be excluded—a conclusion expressly rejected by the Supreme Court in Cornelius. Similarly, the majority's test would determine that the Memorial Day services in Student Coalition converted the field into a limited public forum from which SCP could not be excluded—a conclusion expressly rejected by the Third Circuit faithfully adhering to Cornelius.[1]

### III

Restrictions on access to a nonpublic forum need only be reasonable in light of the purpose served by the forum and be not viewpoint-based. Cornelius, 105 S.Ct. at 3451. The majority states that even if the

---

1. The majority makes no effort to explain how its holding that a limited public forum has been created is reconcilable with Cornelius. Moreover, the majority's efforts to reconcile its holding with Student Coalition are entirely unconvincing. The majority's statement that the school grounds in Student Coalition were nonpublic because access to them was "highly restricted," maj. op. at 1478 n. 9, is untenable. The Third Circuit specifically noted that "Arnold Field has been regularly used for nonschool

sponsored community events.... and is also used regularly without permission by members of the community for jogging, bicycle riding, picnics, and similar activities." Student Coalition, 776 F.2d at 433–34. Again, contrary to the majority's suggestion that the Memorial Day services were not "political or controversial in any respect," maj. op. at 1480 n. 11, the Third Circuit acknowledged that the services posed some "risk of partisan controversy." Student Coalition, 776 F.2d at 437.

fora at issue are nonpublic, the Board's refusal to accept CARD's advertisement violated the first amendment because it was unreasonable and viewpoint-based. I believe that this dicta is ill-considered. I would find the Board's restrictions reasonable; I would, however, remand for a determination whether the Board's rejection of CARD's advertisement was viewpoint-based.

I believe that the Board's exclusion of political advertisements is reasonably designed to avoid disruption.[2] _See id._ at 3453–54; _Student Coalition,_ 776 F.2d at 437. While I understand the majority's view that vocational military advertisements may have political implications, I agree with the Third Circuit that the Board is obligated merely to draw a reasonable line between the political and the nonpolitical. _See Student Coalition,_ 776 F.2d at 437; _see also Lehman,_ 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (upholding municipal policy that prohibited political advertising in city transit vehicles but allowed commercial advertising). Rather than following this line of reasoning, the majority instead incorporates by reference the discussion that it developed in the context of its limited public forum discussion. _See_ maj. op. at 1479. It thus appears that the majority has improperly blended together the different standards of review applicable to restrictions on public and nonpublic forums.

It follows from the above discussion that I cannot agree with the majority that the only reasonable inference is that the Board's refusal of the CARD advertisement constituted viewpoint-based discrimination. None of the district court's findings, however, explicitly addresses whether the Board's rejection of CARD's advertisement was an attempt to suppress CARD's point of view. The district court found that CARD's advertisement was rejected because it was a political advertisement from a non-student source and because it was believed to advocate an illegal act. While these findings strongly suggest no viewpoint discrimination, it would be better if there were a specific finding on this issue. I would therefore remand to the district court for a determination of this issue.

## IV

Thus, I conclude that the Supreme Court's recent pronouncement in _Cornelius_ forecloses the contention that the Board's acceptance of the vocational military advertisements created a limited public forum from which CARD's advertisement could not be excluded. Instead, the forum is nonpublic, and the Board's restrictions are reasonable. Only if the Board sought to suppress CARD's point of view—an issue that should be determined on remand—have CARD's first amendment rights been violated. I cannot join the majority in instructing the district court to enter a preliminary injunction in favor of CARD because, on the present record, CARD has not shown a probability that it would succeed on the merits of its first amendment claim.

2. The majority's refusal to accept this justification, _see_ maj. op. at nn. 10–11, is flawed in several respects. First, irrespective of whether the Board has argued that publication of CARD's advertisements would cause disruption in the schools, the Board has acted pursuant to a policy that it argues was developed and implemented to limit disruption. Second, the majority's suggestion that disruption must already have occurred in order to be legitimately considered is flatly contrary to _Cornelius,_ 105 S.Ct. at 3453 ("the Government need not wait until havoc is wreaked to restrict access to a nonpublic forum"), _Perry,_ 460 U.S. at 52 n. 12, 103 S.Ct. at 959 n. 12 (proof of past disturbances not required to justify the denial of access to a nonpublic forum on grounds of potential disruption), and _Student Coalition,_ 776 F.2d at 437 (same). The majority's further suggestion that the possibility of disruption must be well-documented in the record, _see_ maj. op. at n. 10, is equally in conflict with Supreme Court precedent. _See Perry,_ 460 U.S. at 52 n. 12, 103 S.Ct. at 959 n. 12.